v. Ill. Municipal Retirement Fund, et al. 518-0267, counsel ready? Thank you, your honor. May it please the court and counsel, my name is Matthew Davis. I represent the appellant Teresa Miller in this matter, which comes to the court today under the Illinois Administrative Procedures Act. Ms. Miller worked as a custodian for the Columbia School District beginning in 1989. In 2011 she suffered a back injury which caused her to stop working. She received temporary disability payments under the Illinois Municipal Retirement Fund pension and she ultimately was not granted total disability payments. We've appealed that through the courts and are here today for judicial review of the board's decision. We are asking the court particularly to pay notice to the Hadler case which came out in February of 2018 from the 2nd District Appellate Court. It is very much on point and consistent with the factual allegations in this case and we believe that close analysis is appropriate for this court to adopt as well. We acknowledge that we have an incredibly difficult standard of review. In order to overturn the board's decision, this court would have to find that it is against the manifest weight of the evidence. I don't think there's a more difficult standard to overcome. However, with sort of the great powers the board has, it also has a great responsibility with my apologies to Spiderman. And the 2nd District found that they did not meet those responsibilities and that is very similar to this case. The board relied primarily on the opinions of two experts which they hired. First was their doctor who reviewed the medical records of Ms. Miller, Dr. Rao, and then in order to assess the vocational element under the definition of disability under the pension code, they hired a vocational consultant. Again, that is identical to what happened in the Hadler case. In the Hadler case, the court found that Dr. Rao did not provide an adequate explanation of his opinion that the plaintiff was disabled. That opinion is almost word for word identical in its ultimate conclusion to the opinion in this case. In the Hadler case, what the court said was that while the board is given great discretion to rely on its own physician who reviewed the records and is not required to agree with the treating physicians, who did provide evidence in the case of Ms. Miller in this case that she could not work and it was a permanent condition. However, the board and particularly Dr. Rao is required to explain why there is a disagreement and they did not do that in this case. In this case, Dr. Rao hyper-focused on one single paragraph in one single medical record and that was the last medical record that Ms. Miller's treating surgeon has in the records. It was the record where he said that Ms. Miller had achieved maximum medical improvement from his perspective as her surgeon who performed a multiple level fusion on her back and gave her a permanent restriction of lifting no more than 20 pounds. That's it. That is the evidence which the board then determined that she was no longer disabled. In order though to accept that, the board had to ignore and Dr. Rao had to ignore the other evidence in the file, particularly subsequent to being released by the surgeon who had nothing left to do since the surgery was completed. They ignored the physical therapy records which said that she had a fair prognosis and was moderately disabled, experienced constant pain with motion and had a limited ability to stand and walk. They also had to ignore the opinions of her primary care physician who completed a questionnaire provided by IMRF to certify that Ms. Miller was unable to work, that she had limited ability to stand and walk and in addition the treating physician completed another questionnaire that said in an 8-hour work day the most that she could even sit was 4 hours. Finally, in 2015, continuing to try to improve her condition, Ms. Miller went to an occupational therapist. The occupational therapy records documented in a very practical format over the course of three months an attempt to get Ms. Miller even to be able to complete her regular activities of daily living. And their ultimate conclusion was that in addition to the pain which limited her ability to function physically over a consistent basis, she also had difficult problems in trying to recreate a work environment with memory, understanding new concepts and combined with the pain and the medication just had an overall difficult time getting through the day. All of that was objective medical opinion from people who actually treated Ms. Miller, who treated her over a consistent period of time and all of that was not explained why that was to be disregarded by the board or by Dr. Rao. Very similar again to the Hadler case where the court said even with all of that overwhelming burden on the plaintiff in order to overcome the board's opinion, there still had to be some explanation in the board's opinion about why all of this other evidence was to be ignored, why they disagreed with that evidence. They have the prerogative to disagree with that evidence, but ultimately they have to show their work. And that just didn't happen in this case. The next component in addition to the medical component is a vocational component. And under the pension code, the definition of disability includes a vocational component that a person is totally disabled if they can't perform gainful activity. And in the IMRF rules, it is not necessarily completely defined what gainful activity is, but they do adopt the Social Security earnings limitations in order to determine under their rules whether someone can perform gainful activity. Under the pension code, they also have the alternative to hire a vocational expert and that's what they did in this case. However, the vocational expert's report, again, did not consult all of the medical records and relied specifically on the 20-pound lifting restriction, which Dr. Kennedy gave in his final medical record, did not look at all of the other evidence in the file, including occupational therapy records, physical therapy records, and the opinion of the treating physician that she could only sit for a maximum of four hours. Used that limitation to say that she was able to perform work in a sedentary capacity or even in a higher capacity, a light capacity, which would have greater lifting and movement restrictions in those job restrictions. In addition to that, it's very clear from the report from the vocational counselor if her analysis used the gainful activity definition provided by Social Security. Her report said that Ms. Miller had earnings capacity, which is a different standard than gainful activity using the Social Security earnings limits. Earning capacity could mean anything. You could make any amount of money. But the Social Security requirements are that you have to be able to have an amount of income that is under their rules and under their grids. Without any explanation, without saying whether or not what restrictions and limitations besides the 20-pound earnings, without the 20-pound restrictions, the vocational counselor just simply says that she has earning capacity and therefore is not disabled. Again, while the board has a great latitude to use these experts and rely on their opinions, we believe that, again, they have to show their work. And it has to have a rational basis. It's hard to square the Social Security earnings limitations. It's hard to square the limitations and restrictions given by the treating physicians and then to say that Ms. Miller, who had for a decade been a janitor, could now go out and find new work in the hospitality industry, which most of these jobs were, some of them light, some of them sedentary. There's no analysis about how much these jobs require sitting, about how much these jobs require the ability to change positions, about whether or not she is allowed to rest during the day. Again, another one of the restrictions given by the doctors. The vocational analysis is just simply we found four jobs which we think are good enough without any analysis. Again, they have to show their work, and they fail to do so. And there is not a rational basis for their decision. I think that the analysis in the Hadler case is very much on point with this case. We would urge the court to adopt their analysis and scrutinize the opinions of Dr. Rao as well as the written decision of the board and the opinions of the vocational analyst under that light, that there is a requirement that if there's going to be a disagreement in the record, that there has to be some explanation. Under this standard, it probably doesn't have to be that long of an explanation. It could probably be a very brief explanation. It could probably be an explanation that while everyone believes I wouldn't have come to that explanation, there is some rational basis for it. But in this case, there just simply isn't one. They came to a conclusion based upon one note and one record and ignored the substantial evidence that pointed the other direction and didn't meet their responsibility to explain why that other stuff that weighed in favor of disability should be disregarded. And that is, even under the manifest weight of the evidence standard, that is their responsibility. They failed to do so. So, therefore, I think that the court should conclude that there was a mistake made and that the decision was wrong and, therefore, that the decision should be reversed. Are there any questions? Thank you, counsel. Thank you. Good morning, your honors. May it please the court. Counsel. My name is Vladimir Shuliga. I represent the defendant appellees in this case, the Illinois Municipal Retirement Fund, and the corresponding board of trustees. I appreciate the fact that counsel has acknowledged that it's an exceedingly high burden for the plaintiff in an administrative review action to overcome on administrative review. And I want to spend a little bit of time emphasizing some of the case law that reiterates that high burden that the plaintiff has to overcome and why the plaintiff does not overcome that burden in this case, notwithstanding the handling decision that came out in 2018. There's no dispute that it's the manifest weight of the evidence standard that applies. The definition of gainful activity is not in dispute. Everybody agrees that the board has the authority to adopt the definition of gainful activity that it adopted pursuant to its board resolution, and that definition is quoted in full on page 10 of our brief. The statute itself, the administrative review statute, provides that the findings and conclusion of the administrative agency on questions of facts shall be held to be prima facie true and correct. That has been reaffirmed by a whole host of case law. The Supreme Court has gone on to say, and this is in the Abramson v. Illinois Department of Professional Regulations case, that it is not our viewing court's function to re-weigh the evidence or make an independent determination of facts. It's the court's function to determine whether the findings and decision of the agency are against the manifest weight of the evidence. And the decision will not be against the manifest weight of the evidence unless the evidence shows that the opposite conclusion is clearly evident. The mere fact that another conclusion is reasonable and that the reviewing court would come to a different conclusion is not sufficient. A reviewing court may not substitute its judgment for that of the administrative agency, the board in this case. What the Abramson court said was that if the record contains evidence to support the agency's decision, it should be affirmed. May I encourage the counsel that we do understand that standard of review and to go on and argue the facts that support the IMRF's decision? Absolutely, Your Honor. I think highlighting that standard is important because, as counsel noted, he believes that the board has to show its work. The board has to say something or explain its reasoning. While that is true to some extent, the Abramson court is telling us that the record has to contain evidence. The board doesn't have to adopt or doesn't have to have some explanatory proposition for why its reasoning is what its reasoning is, as long as the record contains evidence to support that decision. The Habler case reaffirmed the standard of review. It didn't change it. It added a wrinkle to it, which the court didn't explain too much, but it added the wrinkle that the reviewing court should not re-weigh the evidence, but it has to evaluate the reliability of the underlying evidence. Now, I call that a wrinkle because it's curious how an administrative agency, such as the Board of Trustees of IMRF, can weigh the evidence that is presented before it without evaluating its reliability. I think inherently in an administrative agency's obligation to weigh the evidence that's presented to it as the finder effect, it must determine whether that evidence is reliable. The court in Habler didn't provide any guidance as to what the difference is. Even though the court said we're not going to weigh the evidence, we're going to evaluate its reliability, and then determine the decision was against the manifesto rate of the evidence. Now, I'm not here to re-argue the Habler case. The Habler case is what the Habler case is, and while the court didn't give me enough guidance to decipher the difference between re-weighing evidence and evaluating its reliability, I think before Habler, this decision must be affirmed, and after Habler, this decision must be affirmed. In order to overturn the IMRF decision in this case, this court has to conclude that no rational trial effect could have concluded that Ms. Miller is capable of any gainful activity when her own doctors confirm that she is capable of sitting for at least four hours a day, standing or walking for an additional three hours, as long as she's allowed to change positions or rest in between some walking or standing intervals. There's no need for her to lie down or elevate her legs during the workday, and all of these are confirmed by her treating physicians. It's her physician's assistant, Andrea Thomas, and Dr. Michael Kirk, which were treating physicians after her surgeon released her to work with only the 20-pound lifting restriction. So there are a multitude of treating physicians. Now, was this released before or after the mental situation was brought up? The release, the 20-pound lifting restriction release, is that what you're referring to? That release was given in 2012. So this was while Ms. Miller was still on temporary disability benefits. And I will draw the distinction between the standard for temporary disability benefits and total and permanent disability benefits a little bit later. But that was the initial release, which actually caused her temporary disability benefits to be interrupted. When IMRF interrupts temporary disability benefits, it affords the applicants an opportunity to provide additional evidence to determine whether temporary disability benefits should be reinstated. That's what happened in this case. Those benefits were reinstated, and ultimately, Ms. Miller was reviewed for total and permanent disability benefits. The distinction in those two types of benefits is that the temporary disability is based on the job that the individual has at the time. In this case, Ms. Miller was a custodian. So the question is, can she do the job that she has? And it was determined that she could not. Even after the 20-pound lifting restriction, the temporary benefits were suspended because the assumption is that she can go back to work for her employer. Her employer informed IMRF, we cannot accommodate the 20-pound lifting restriction. Therefore, she can't do that job, and the temporary benefits were reinstated. She received the maximum allotment of temporary disability benefits, 30 months by statute. You get up to half of your service credit. So if you have at least five years of service credit, which Ms. Miller had more than that, then you get the maximum 30 months of temporary disability, as long as you're medically qualified for it. In this case, Ms. Miller was. At the conclusion of your eligibility for temporary disability benefits, IMRF automatically reviews every single case of temporary benefits that exhaust the full 30-month period, automatically reviews it for total and permanent. So IMRF never came to the conclusion that she was no longer disabled. IMRF came to the conclusion that she doesn't qualify for total and permanent disability benefits, which is a different standard. That standard asks, is she capable of any gainful employment? Any gainful employment. So we're not looking at her custodian job anymore. We're looking at what her condition is and determining, can she perform any gainful employment? And when the Board of Trustees adopted its definition of gainful employment, it made one reference to the Social Security definition. The one reference is gainful employment will be determined if they can reach the substantial earnings capacity that the Social Security Administration propounds on an annual basis. At the time that the decision was made, I want to say that the dollar threshold was roughly $13,000 a year. It's since gone up. Another component of IMRF's definition of earnings, excuse me, of its definition of gainful employment, is that the definition itself allows the board to seek guidance from a vocational expert. And that vocational rehabilitation expert does a labor study to tell the board whether there are or aren't jobs for the individual to perform given the skills, education, and physical and mental limitations that the individual has. That occurred in this case. The reason that this case is different than Handler is because the Handler case, the court in Handler said the court exclusively relied on Dr. Rao's opinion and the voc rehab consultant's opinion. In this case, the board did not rely exclusively on those decisions. The board relied on the underlying evidence provided by Ms. Miller, by Ms. Miller's treating physicians, to provide that she's released to work, her surgeon released to work with a 20-pound lifting restriction. Her primary physician after that, primary care physician says she can sit for at least four hours, walk and stand for an additional three hours, doesn't need to lay down, doesn't need to elevate her legs. The plaintiff in Handler couldn't walk or stand for more than a few minutes. And throughout the workday, she would unpredictably have to lie down and elevate her legs. The court said there's no job for this person. That's why the court made that determination in Handler. Those facts are simply not here in this case. Her own treating physicians are saying that she has some capability to perform work. Now, they ultimately come to the conclusion they checked the box, totally and permanently disabled. They checked that box. But the board can look further than the conclusion of the treating physicians. The board can look to what the underlying records say. And the underlying records in this case say she can, according to her surgeon, she can perform any work as long as she doesn't have to lift more than 20 pounds. If we take that release away, she can do a job which allows her to sit for four hours and walk and stand for an additional three hours. That's what her treating physician says she can do that. So the board can look at those underlying records and say, even though you checked the box, it says she's totally and permanently disabled, that's not what the objective medical evidence says. You're saying right here that she can do these things, and then you're saying that she has no earning capacity. So even if we say that Dr. Law wrote the worst report, the vocation of the person. My question was, did anybody take into consideration the mental situation when it said short term or was it memory situation? It was not considered. At no point was her mental capacity or her mental limitations. I thought there was a report on that. I believe there was a report from her physician, yes. What did he say? I believe it was part of the occupational therapy treatment finding that she had difficulty with multi-step directions. I think it was the ultimate finding. The reason that that wasn't evaluated as part of the basis. So that wasn't even considered. That was not considered for purposes of qualifying for total and permanent disability because under the statute 7-150 of the pension code, IMREP may only consider those diagnoses that are rendered prior to termination. Ms. Miller, her omni-job injury I believe was in early 2011, and her employer terminated her that same month. So any issues that arose after January of 2011, after her termination date, the statute prohibits that being the basis for total and permanent disability benefits. So if there's something else that arises while the appeal is pending or arises while you're on temporary disability benefits for 30 months, if something arises after that, by statute IMREP is prohibited from considering that. I thought they said that what happened to her was caused her to have a short-term situation. I don't believe that stated right there. I don't know what the genesis of the mental capacity issues are. But the diagnosis and the application for disability benefits over and over stated, it's lumbago, it's the laminectomy, it's the back pain, it's the back pain, it's the back pain. So that's what was evaluated and that's what was questioned to determine whether total and permanent disability benefits are appropriate. Counselor, the black proposal counsel is arguing that taking this one sentence from the doctor's report and maybe taking it out of context, how do you address that? Certainly. So the one sentence from the doctor's report was in 2012. Ms. Miller received temporary disability benefits through 2014. Then she was evaluated for total and permanent disability benefits. Dr. Rao made an initial determination based on the medical records in the file in 2015 initially. If IMRF's decision was based solely on that one sentence, then there would have been no need, IMRF would not have requested additional medical records. IMRF would not have requested the Social Security Administration determination. IMRF would not have held a hearing. IMRF would have said, there's the sentence, Dr. Rao agrees, we're done. That's not what IMRF did in this case. IMRF said, Dr. Rao, you've come to this conclusion, okay, we're going to have a hearing. Before the hearing, Ms. Miller, if you have any other information, provide it to us. She did. In the additional information that was provided after the initial review done by Dr. Rao, the additional information is what included her physical limitations questionnaire that we had. And her doctor said in that questionnaire, she can sit for up to four hours a day, she can walk or stand for an initial three hours a day. So those are the limitations. And at the very end of all the record collection, everything goes back to Dr. Rao and everything goes to the vocational consultant to make sure they have a total picture. And the vocational consultant said, with the 25-month restriction and the job that allows her to change positions, these are the jobs that are available, and provided a list of jobs that were available. And the vocational consultant doesn't make reference specifically to the Social Security earnings threshold because it lists the dollar amounts that the individual can make. The board can look at the two dollar amounts and determine whether it reaches a threshold or not. And all the jobs that were listed as available exceeded the threshold. So there's certainly evidence in the record to support IMRF's decision. Reasonable people can disagree. The fact that this court may come to a different conclusion, the fact that the Hager court came to a different conclusion, doesn't mean that this decision was against the manifest way to the evidence. You have to come to the conclusion that no rational prior effect could come to the conclusion that the IMRF board of trustees came to. And with the evidence in the record, you simply can't come to that conclusion. If the additional requirement after Hager is that you have to evaluate the reliability of the evidence in the record, then you have to evaluate the reliability of her own medical records. Ms. Miller's own medical records provide that she has been cleared subject to the 20 pound lifting restriction and she has these physical abilities provided by her primary care. If you deem that those aren't reliable, then how can you come to the conclusion that she's ultimately qualified for total and permanent disability benefits? Because if you do come to the conclusion that IMRF's decision was against the manifest way to the evidence, then you have to reinstate her, or excuse me, for the first time give her total and permanent disability benefits. But in order to come to that conclusion, you have to determine that there's no reliable basis in the evidence when the evidence itself are her own medical records. Now I want to briefly touch on the judicial notice of readily verifiable evidence argument that counsel made in his reply brief with regard to the citation of the dictionary of occupational titles. I think that's additional information that wasn't presented during the administrative hearing. It is beyond the scope of this review. I don't believe that a secondary source which provides some persuasive evidence is a readily verifiable fact. I think it's persuasive evidence, certainly, but it isn't something that can be presented in this court to overturn the decision of an administrative agency that was never presented with that evidence. The case that was cited in Plano's brief, IDHS versus Porter, when it acknowledges this judicial notice of verifiable facts, the fact that it's appropriate, immediately after it allows itself to take judicial notice of a fact in that case, it then says, quote, Porter apparently wants this court to take judicial notice of these documents to undermine the commission's decision in this case. Porter says no authority in support of doing so, and the court refused to do it. So while you may take judicial notice of the dictionary of occupational titles, the case law says you can't use that as a basis for overturning the IMRF Board of Trustees. So if you look at the record in totality, there's absolutely evidence in the record to support the decision of the IMRF Board of Trustees before or after Hadler. So the position of the IMRF is that the board's decision should be affirmed. Are there any questions? Thank you, counsel. Please. The pension code's definition of gainful activity includes a statement that says, when making this gainful activity determination, consideration shall be given to an application's education and work experience, although the determination of whether an applicant is able to engage in gainful activity is not limited to employment in the field or the applicant had previously worked, studied, or trained. In order to undertake that requirement, IMRF hired a vocational expert. The vocational expert, however, based her opinion on the statement that Ms. Miller can lift up to 20 pounds and has been released to return to work with the ability to alternate positions. There's no evidence in the file, in the two-and-a-half page, three-and-a-half page report, that the education, training, and experience of Ms. Miller at the time of the report, which was in 2016, May of 2016, that the vocational consultant looked at that. She only looked at whether or not she could lift 20 pounds and alternate restrictions. Ms. Miller was having problems remembering. She was on a great deal of medication. She was under severe pain. That was in her primary care physician's records. It was in a questionnaire completed by the primary care physician. It was in the occupational therapy records where they were trying to see what types of jobs, if any, she could even do. She couldn't do it because she was in pain. She also couldn't do it because she was having a hard time learning new things. I will submit that's all part of the education, training, and experience that IMRF's vocational analysis had to contain. Again, they only stuck with the 20 pounds and alternate positions. Part of the reason we included the definitions in our brief was just by way of the OMNET classifications, which Social Security uses, is just to show how off-base the vocational analyst's report is because she doesn't take into account the four-hour limitations. She doesn't take into account the extended breaks. She doesn't take into account the fact that Ms. Miller has never had a customer service public-facing job and now suffers with these restrictions, and they expect her to go out and work at the Olive Garden or at Jiffy Lube or at the YMCA as customer service representatives. None of that analysis is in here. They could have done it. They could have done that analysis and come to the same conclusion, and I would have a very difficult time standing up in here and asking you to argue against it. But because they didn't, this Court can do what the Court didn't have her and say that looking just at face value of evidence, without weighing it, the reasonable and just conclusion is that there is no evidence to show that she could perform gainful activity. Thank you. Thank you, counsel, for your arguments. The Court will take this matter into advisement to render a decision in due course.